# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF GEORGIA

# STATESBORO DIVISION

CAROLYN B. PHILLIPS,     )
                    )
     Claimant,     )
                    )
v.                )     Case No. CV606-104
                    )
MICHAEL J. ASTRUE,     )
*Commissioner of Social Security*,     )
                    )
     Defendant.     )

## REPORT AND RECOMMENDATION

Claimant challenges the Social Security Commissioner's denial of her application for disability insurance benefits. For the reasons that follow, the Court recommends that the Commissioner's decision denying benefits be **AFFIRMED**.

## I. BACKGROUND

### A. Procedural History

Claimant, a nursing assistant, filed for disability insurance benefits on March 31, 2004. (Doc. 17.) She alleges that she became disabled on

December 10, 2003. (Tr. 55.) Her claim was denied initially and upon reconsideration. (Tr. 25-28, 31-34.) She requested an administrative hearing, which was held on March 17, 2006 before Administrative Law Judge ("ALJ") Robert Foerster. (Tr. 289.) The ALJ issued a decision denying claimant's application for benefits on July 25, 2006. (Tr. 13-21.) On October 5, 2006, the Appeals Council denied claimant's request for review of that decision, thereby adopting the decision of the ALJ. (Tr. 9-12.) On November 1, 2006, after considering an additional medical report provided by Dr. Deloach, the Appeals Council once again denied claimant's request for review of the ALJ decision. (Tr. 4-8.) Claimant then filed the present action for review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). (Doc. 1.)

## B.    Factual and Medical Background

Claimant was forty-four years old when she allegedly became disabled; she is currently forty-nine years old. (Tr. 55.) She is married with two adult children. (Tr. 290.) She has a ninth grade education, but she has earned her high-school equivalency diploma. (Tr. 295-96.) She has worked as a wallpaper installer, a sealer, and, most recently, a nursing assistant.

(Tr. 294-95.) Claimant has not been regularly employed since June 2003.[1]

(Tr. 84.) She contends that she can no longer perform her job as a nursing

assistant due to her chronic pain. (Tr. 294.)

i. *Medical Evidence Presented to the Commissioner*

While working as a nursing assistant on July 19, 2000, claimant

experienced back pain when she moved a patient to the center of a bed. (Tr.

189.) After the incident, she saw Dr. Russell Holland at Chatham

Orthopaedic Associates. He recommended physical therapy. (Id.) On

September 27, 2000, claimant returned to Dr. Holland with complaints of

increased pain. (Tr. 147.) He recommended an MRI scan, which revealed

that claimant suffered from degenerative disc disease. (Tr. 146.) However,

he did not see anything seriously wrong with her back. (Id.)

On November 8, 2000, claimant visited Dr. Paul Lorenzen, also with

Chatham Orthopaedic Associates. (Tr. 145.) He found that she was

neurologically intact, with perhaps slight sciatica. (Id.) Dr. Lorenzen

referred her to Dr. Bodziner for a neurological evaluation. (Id.) On

---

[1] When discussing this with the ALJ she said that she had not worked since 2002.
(Tr. 293.)

November 30, 2000, Dr. Bodziner did a myelogram and EMG[2] but found nothing unusual. (Tr. 144-45.)

Claimant visited Dr. Holland again on December 14, 2000; he recommended that she return to work. (Tr. 144.) While at work on September 14, 2001, she again experienced severe pain while moving a patient. (Tr. 189.) Shortly thereafter, she was evaluated by another orthopaedist, Dr. Heiges, who administered two epidurals. (Id.)

On April 4, 2002, claimant was examined by Ganesh Prasad, M.D., at the East Georgia Regional Medical Center Pain Clinic. (Tr. at 233.) She complained of chronic lower back pain with some radiation of the pain to the left ankle. (Id.) Claimant described her pain as a deep, hard, constant, throbbing, aching pain which starts in the lower back and spreads all the way to the outside of the left ankle. (Id.) Claimant noticed numbness in her lower left leg, and she told Dr. Prassad that during periods of increased pain she walks with a limp. (Id.) She also stated that her left knee gives way intermittently. (Id.) The pain increased with movement or from sitting in the same position for long periods of time. She stated that she could not rest

---

[2] "A graphic representation of the electric currents associated with muscular action." Stedman's Medical Dictionary 553 (26th ed. 1995).

adequately at night because of the pain.  (Id.)  After reviewing a CT scan taken in October, 2001, Dr. Prasad noted that the lumbar spine shows a broad based disc bulge at the L4-L5 level causing moderate central canal encroachment but that there was no definitive evidence of neural foraminal[3] encroachment, spondylolisthesis,[4] or compression deformity. (Tr. 234.) Mild bilateral facet joint disease was also reported.  (Id.)

Dr. Prasad physically examined claimant's lower back, finding tenderness over the lumbar muscles at the L4-L5 and L5-S1 levels.  (Tr. 235.)  Pressure produced radiation of pain to the left hip.  (Id.)  Lateral rotation of the spine to the right side produced a radiation of pain to the left ankle.  (Id.)  Finally, there was a mild decrease in sensations relating to pin pricks on the lesser aspect of the left leg all the way from the knee to the ankle, but there was not a motor deficit.  (Id.)  Her reflexes were within normal limits.  (Id.)  Dr. Prasad diagnosed claimant with chronic lower back pain, underlying degenerative disc disease, and facet arthropathy.  (Id.)  He treated her with a caudal epidural steroid injection.  (Id.)  He also prescribed

---

[3] "An aperture or perforation through a bone or a membranous structure." Stedman's Medical Dictionary 674 (26th ed. 1995).

[4] "Degeneration or deficient development of the articulating part of a vertebra." Stedman's Medical Dictionary 1656 (26th ed. 1995).

her Celebrex, Zanaflax, Elavil and Ultram. (Tr. 236.)

On April 19, 2002, claimant again saw Dr. Prasad. (Tr. 230.) She reported excellent pain relief from the epidural steroid injection, but her pain gradually returned. (Id.) Dr. Prasad once again administered an epidural injection. (Id.) He also referred claimant to a physical therapist for evaluation and treatment. (Tr. 231.) On May 7, 2002, claimant again returned to Dr. Prasad. (Tr. 227.) She reported that she no longer noticed pain radiating down the lower left leg. (Id.) She reported that the pain over her lower back was a throbbing, aching, constant pain with significant stiffness, especially in the early morning. (Id.) Dr. Prasad then performed a diagnostic lumbar facet median nerve block at the lower lumbar levels and a trigger point injection at two trigger points on her back. (Tr. 227-28.)

Dr. Prasad had a follow-up consultation with claimant on May 16, 2002. (Tr. 224.) Claimant reported excellent pain relief from the nerve blocks, but complained that while driving to work she suddenly noticed that both of her legs became icy cold and felt numb. (Id.) Dr. Prasad withheld any further injections at that time as the patient was relatively pain free. (Tr. 225.)

On May 21, 2002, claimant once again visited Dr. Prasad, complaining of tingling numbness in the lower extremities, mostly in her feet. (Tr. 221.) She also experienced intermittent radiating pain down her lower left leg. (Id.) She reported a much higher pain score than in her last visit–she had increased from a "0" to a "5-6" in five days. (Id.) The doctor noted that lateral rotation and hyperextension of the spine worsened the pain and that she experienced decreased sensation to the pin prick test. (Id.) Once again, Dr. Prasad proceeded with a caudal epidural steroid injection. (Tr. 222.) He recommended that claimant continue with her physical therapy. (Id.)

On May 28, 2002, claimant saw Scott Bohlke, M.D., a doctor with Bohler Family Practice, regarding various symptoms. (Tr. 194.) She complained of menstrual problems, fatigue, and various other problems. (Id.) On May 30, 2002, claimant visited the East Georgia Regional Medical Center Emergency Room with the same complaints along with general malaise. (Tr. 219.) Brian Kornblatt, M.D., a radiologist, examined her films and found a nonspecific bowel gas pattern but no acute cardiopulmonary process. (Id.) On May 31, 2002, claimant returned to the East Georgia Regional Medical Center Pain Clinic and met with Sandeep Datta, M.D. (Tr.

209.) She told him that she was unfocused, had problems with her period, felt nervous, and occasionally had chest pains. (Id.) She stated that she went to the emergency room the day before because she was convinced she was going to die. (Id.) Dr. Datta told her that the steroid injections may have caused the menstrual symptoms but were unlikely to have caused her other symptoms. (Id.) He referred her to another doctor for treatment. (Id.)

On June 6, 2002, claimant returned to Dr. Datta. (Tr. 205.) Based upon the short period of pain relief from the lumbar facet blocks, he found that patient appeared to have lumbar disc disease as well as lumbar facet disease. (Id.) He once again treated her with a caudal epidural steroid injection. (Tr. 206.) He prescribed an increased dose of Elavil. (Id.)

On June 18, 2002, claimant once again met with Dr. Prasad. (Tr. 202.) He noted that following each injection, after a short period of time, claimant started developing a vague feeling of unease along with varied symptoms, including swelling of the face, discoloration of her feet, and a feeling of anxiety and nervousness. (Id.) She rated her current pain level at "4-5" out of "10." (Id.) Upon examining her lower back, Dr. Prasad noticed that there

were multiple scattered trigger points and tenderness over the lumbar facets L3-4, 4-5, and L5-S1. Pressure at L5-S1 produced radiation of pain to the buttock and upper thigh on each side. (Id.) Hyperextension and lateral rotation of the spine still worsened the pain. (Id.) In his impressions, he now stated that claimant suffered from chronic mechanical lower back pain possibly secondary to lumbar spondylosis[5] and lumbar facet arthropathy, underlying degenerative disc disease, and myofascial[6] pain. (Tr. 203.) Based upon claimant's reported symptoms after the steroid injections, Dr. Prasad decided to withhold the use of steroids for the time being. (Id.) He continued her medication and physical therapy exercises and recommended a follow-up with a psychiatrist for evaluation and treatment. (Id.) On June 24, 2002, Dr. Prasad once again performed diagnostic facet median nerve blocks. (Id.)

On August 5, 2002, claimant had her initial assessment with another neurologist, Spencer Paterson, M.D. (Tr. 189.) At this point, she described

---

[5] "Ankylosis of the vertebra; often applied nonspecifically to any lesion of the spine of a degenerative nature." Stedman's Medical Dictionary 1657 (26th ed. 1995). Ankylosis is defined as "[s]tiffening or fixation of a joint as the result of a disease process, with fibrous or bony union across the joint." Id. at 93.

[6] "Of or relating to the fascia surrounding and separating muscle tissue." Stedman's Medical Dictionary 1168 (26th ed. 1995).

her pain as deep and burning. (Id.) She said that she had numbness of her legs and feet, associated headaches, and that sitting, standing, lifting, lying, bending, and stooping all aggravate her symptoms. (Id.) Dr. Paterson believed her symptoms were characteristic of radiculopathy. (Tr. 190.) He recommended another MRI and possibly an EMG. (Id.) On December 23, 2002, claimant followed up after performing an MRI. (Tr. 140.) Paterson found everything to be normal, aside from mild desiccation of the L4-5 and to a lesser degree L2-3 and L3-4 discs. (Id.)

From May 14, 2003 to November 5, 2004, claimant regularly visited Dr. Paterson. (Tr. 131-139, 188.) He prescribed Elavel, Neurontin, Naproxen and Ultram. (Id.) Dr. Paterson then referred her to Michael Taormina, M.D., another neurologist, who she visited on February 11, 2005. (Tr. 186.) He kept her on Neurontin and Ultram, and also prescribed her Verelan PM. (Id.)

Dr. Taormina referred her to the Medical College of Georgia, where she was treated by Dr. Serrano from October 13, 2005 through the present. (Tr. 180-185, 291.) Dr. Serrano diagnosed claimant with generalized neuropathy, lower back pain, and restless leg syndrome. (Tr. 181.)

## ii. *State Medical Examiners*

On April 4, 2004 and August 3, 2004, claimant was assessed by Doctors Baltazar and Marira, respectively, who are both non-examining state disability consultants. (Tr. 172, 150.) Based upon her medical records, they determined that she could occasionally lift 50 pounds and could lift 25 pounds frequently, she could stand or walk for about six hours a day and sit for about six hours a day, and she could push and pull an unlimited amount. (Tr. 173, 151.) They also found that she should be capable of climbing, balancing, kneeling, and crawling frequently, but can only stoop or crouch occasionally. (Tr. 174, 152.) She had no manipulative, visual, communicative, or environmental limitations. (Tr. 175-177, 153-154.) Finally, both consultants noted that she was partially credible but that there was not enough objective evidence to preclude all work. (Tr. 177, 155.)

On September 20, 2004, the state assessed claimant's psychiatric health. (Tr. 158.) The consultant, Dr. Vidic, found that she suffered from medical impairments including mild depression, but the impairments were not severe. (Tr. 158-170.) He concluded that her mental state resulted in no restrictions of activities of daily living, mild difficulties in maintaining

social functioning, mild difficulties in maintaining concentration, and no episodes of decompensation. (Tr. 168.)

The ALJ referred claimant to Steven Novack, M.D., for a consultative orthopedic examination after the initial ALJ hearing. (Tr. 237.) After examining claimant, Novack also concluded that she is capable of working. (Tr. 238.)

iii. *Testimony before the ALJ*

On March 17, 2006, the ALJ held a hearing to inquire into whether claimant was "disabled" under the regulations. (Tr. 289-308.) Claimant testified that she had not earned income since June of 2002. (Tr. 294.) When questioned about her current physical capabilities, claimant testified that she cooks, washes dishes, sweeps, mops, vacuums, washes clothes, makes her bed, and goes for small walks around her yard. (Tr. 296-97.) She does very little driving because it is difficult for her to push the brake and accelerator pedals. (Id.) Claimant testified that she rarely went grocery shopping alone because of her pain. (Id.) Her only social interaction involves her family coming to visit her. (Tr. 297.) She has chronic sleeping problems. (Tr. 298.) She stated that she can stand up for twenty to thirty

minutes so long as she is not standing in one spot. (Tr. 298.) She is able to sit for twenty or thirty minutes before she becomes extremely uncomfortable. (Tr. 299-300.) She stated that it is extremely painful for her to bend and stoop, push and pull large objects, or go up the stairs. (Tr. 299-301.) She contends that she can only comfortably lift items that weigh approximately the same as a container of orange juice. (Tr. 299.)

On examination by her attorney, claimant testified that all activities are extremely painful on bad days, and that bad days occur roughly three times a week. (Tr. 299-301.) On those days, claimant states that she lives in misery–she cannot lie down, walk around, or sit for long periods of time. (Tr. 302.) She has to force herself to move around. (Id.) She also suffers from numbness in her fingers on some days. (Id.) Finally, she stated that her husband helps her around the house by washing dishes, preparing the table, cooking on the weekends, doing the yard work, taking out the trash, and "stuff like that." (Tr. 304.) Her husband must go with her to grocery shop so that he can help lift heavy items and push the cart. (Tr. 305.)

Regarding her work prospects, claimant's attorney stated that she could not engage in competitive employment. (Tr. 307.) Claimant testified

that she cannot return to work until something is done that controls her

pain. (Tr. 304.)

## II.  DENIAL OF BENEFITS

### A.  The Five-Step Test for Determining if a Claimant Qualifies for Disability Benefits

The Court's review and the Commissioner's determination in this case

is controlled by the relevant Social Security Regulations, which set forth a

five-step evaluation for determining whether a claimant qualifies for

disability benefits. 20 C.F.R. § 404.1520; Jones v. Apfel, 190 F.3d 1224, 1228

(11th Cir. 1999). The burden of proving disability lies with the claimant. 20

C.F.R. § 404.1512; Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).

At step one, the claimant must prove that she has not engaged in

substantial gainful activity. Jones, 190 F.3d at 1228. At step two, she must

demonstrate a severe impairment or combination of impairments. Id. Then,

at step three, if the claimant's impairment meets or equals a listed

impairment, she is automatically found disabled. Id. If not, she must

advance to step four, which requires her to prove her inability to perform

her past relevant work. Id. If the claimant establishes that she cannot perform her past relevant work, then at stage five the burden shifts to the Commissioner to show that other work the claimant is capable of performing is available in the national economy in significant numbers. Id.

## B. Commissioner's Decision to Deny Benefits

After the hearing, the ALJ found that plaintiff satisfied step one of the five-step analysis because there was no evidence that she had engaged in substantial gainful activity after the date of the onset of the alleged disability. (Tr. 17.) Regarding step two, the ALJ concluded that the medical evidence indicated that claimant's degenerative disc disease is "severe" within the meaning of the Regulations. (Tr. 18.) At step three, however, the ALJ held that her disability did not meet or equal, either singly or in combination, one of the impairments listed in 20 C.F.R. Part 404, Subpart P, App'x 1. (Id.) Accordingly, the ALJ next considered whether claimant retained the residual functional capacity to perform her past relevant work; he determined that she could return to work as a nursing assistant. (Tr. 19.) This conclusion was based on the state medical consultant's opinion and the record as a whole. (Id.) As she was found capable of returning to work as

a nursing assistant, the ALJ did not need to address step five.  <u>Jones</u>, 190 F.3d at 1228.  Accordingly, he found that claimaint is not under a disability as defined by the Social Security Act.  (Tr. 20.)  His determination was upheld by the Appeals Council, even after consideration of new evidence offered by Dr. Deloach.  (Tr. 4.)

## III.  DISCUSSION

Claimant raises two issues in her complaint.  She argues: (1) that the Appeals Council failed to give meaningful consideration to new evidence from Dr. Deloach, and (2) that the Commissioner's finding as to residual functional capacity is not supported by substantial medical evidence.  (Doc. 17.)

### A.    Standard of Review

This Court conducts a narrow review of the Commissioner's decision denying disability benefits.  If the Commissioner's decision is supported by substantial evidence and is based upon correct legal standards, the Court will affirm. 42 U.S.C. § 405(g); <u>Wilson v. Barnhart</u>, 284 F.3d 1219, 1221 (11th Cir. 2002); <u>Lewis v. Callahan</u>, 125 F.3d 1436, 1439 (11th Cir. 1997).

"Substantial evidence is something more than a mere scintilla, but is less than a preponderance." Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (quotation marks and citations omitted). It "is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1158 (11th Cir. 2004) (quotation marks and citations omitted). If substantial evidence supports the decision, the Court will affirm even if the evidence preponderates against the Commissioner's findings. Id. at 1158–59 (quotation marks and citations omitted). The substitution of this Court's judgment for that of the Commissioner is not allowed. Barnes v. Sullivan, 932 F.2d 1356, 1357–58 (11th Cir. 1991).

## B.    Appeals Council and Newly Discovered Evidence

Claimant first argues that the Appeals Council did not meaningfully consider evidence submitted from Dr. Brian Deloach offered after the ALJ's determination to deny benefits. (Doc. 17 at 4.) She asks the Court to remand the case to the Social Security Administration in reliance on the Eleventh Circuit's decisions in Falge v. Apfel, 150 F.3d 1320 (11th Cir. 1998), and Caulder v. Bowen, 791 F.2d 872 (11th Cir. 1986).

i.   *Sentence Four versus Sentence Six remands*

Remand is only possible through sentence four or sentence six of 42 U.S.C. § 405(g). Claimant does not specify which sentence she wishes to apply.[7]

> [Sentence four] . . . provides the federal court 'power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing.' [Sentence six] . . . provides a federal court with the power to remand the application for benefits to the Commissioner for the taking of additional evidence upon a showing 'that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding.'

<u>Ingram v. Astrue</u>, 496 F.3d 1253, 1261 (11th Cir. 2007).   Claimant appears to apply the sentence six standard, as she contends that she must show "good cause" for not raising the evidence before the ALJ.  (Doc. 17 at 4.) Remand in this case, however, can only be made pursuant to sentence four.

Sentence four is properly used where, as claimant alleges here, the Appeals Council erroneously denied review after considering new evidence.

---

[7] Claimant's counsel is advised that future filings that fail to designate clearly a request as either "sentence four" or "sentence six" will be deemed vague and unresponsive.  (Doc. 14 at 2.)

Ingram, 496 F.3d at 1264-66. Sentence six remands, on the other hand, are only appropriate where "new evidence [is] presented for the first time in the district court." Id. at 1267. "Our settled precedents establish that a sentence six remand is available when evidence not presented to the Commissioner at any stage of the administrative process requires further review." Id. "Sentence six . . . does not grant a district court the power to remand for consideration of evidence previously considered by the Appeals Council." Id. at 1269.

Accordingly, the Court must review the Commissioner's decision under sentence four to see whether the final decision of the Commissioner (which includes both the ALJ and Appeals Council decisions) is supported by substantial evidence on the record as a whole. See id. at 1266-67.

ii. *Commissioner's step-three determination*

The ALJ, upon reviewing claimant's medical history, concluded that, though claimant's impairment is "severe" within the meaning of the Regulations, it is not severe enough to meet one of the impairments listed in the Commissioner's Listing of Impairments. (Tr. 18.) Specifically, the ALJ found that claimant's degenerative disc disease and depression do not

meet or medically equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, App'x 1, as required under step three of the five-step analysis. <u>Jones</u>, 190 F.3d at 1228.

Claimant does not contest the ALJ's analysis, but instead contends that the Appeals Council failed to properly consider new evidence submitted by Dr. Brian Deloach, claimant's primary care physician. (Doc. 17 at 4.) Dr. Deloach contended that claimant is disabled under § 1.04 of the Musculoskeletal Impairments, 20 C.F.R. Part 404, Subpart P, App'x 1. (Tr. 264.) When reviewing this late-submitted evidence, the Appeals Council simply noted that "Dr. Deloach submitted no objective medical evidence to support his assessment, and the medical evidence of record does not support his opinion." (Tr. 5.) Claimant contends that this analysis "did not provide any reasoning for denying the appeal, and there is no indication that [the Council] meaningfully considered the new evidence." (Doc. 17 at 4.)

After reviewing the notes submitted along with Dr. Deloach's questionnaire, however, the Court finds that the Appeals Council properly considered Dr. Deloach's new evidence. Deloach, a family practice doctor operating well outside of his specialty, presented no objective evidence

demonstrating "nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness) accompanied by sensory or reflex loss and . . . positive straight-leg raising test (sitting and supine)." 20 C.F.R. Part 404, Subpart P, App'x 1. Furthermore, Dr. Deloach does not even allege that claimant suffers from any motor loss accompanied by sensory or reflex loss, as required by the Regulations. Id.; (Tr. 264). All criteria from the listing must be met in order to qualify for benefits. 20 C.F.R. §§ 404.1525(c)(3); 416.925(c)(3). Finally, it appears that he based his opinion on a myelogram taken in 2000, which was part of the record presented to the ALJ. (Tr. 264.) Dr. Bodziner, the neurologist who initially had the myelogram performed, found nothing out of the ordinary when he analyzed it. (Tr. 144-45.) Not only does Dr. Deloach's opinion fail to present any new information, it appears to be flatly contradicted by Dr. Bodziner's analysis.

Accordingly, the Court holds that the Appeals Council's determination is supported by substantial evidence. Claimant is not automatically entitled to benefits; she must instead show that she does not retain the residual functional capacity to perform her past relevant work. Jones, 190 F.3d at

1228.

## C.    **Residual Functional Capacity**

The ALJ found that claimant "retains the residual functional capacity to perform medium exertional work activities." (Tr. 19.) Accordingly, he found that claimant could return to her past relevant work as a certified nurse's assistant. (Tr. 20.) Claimant contests the ALJ's finding. (Doc. 17 at 5.)

The ALJ's determination, however, is supported by substantial evidence. There is simply no objective medical reason that prevents claimant from returning to work. Dr. Holland did not see anything seriously wrong with claimant upon reviewing her MRI in 2000. (Tr. 146.) In 2002, after performing another MRI, Dr. Paterson found everything to be normal, aside from mild desiccation of the L2-5 discs. (Tr. 140.) In May of 2003, Dr. Paterson told claimant that she could work. (Tr. at 139.) Furthermore, at the request of the ALJ, claimant was seen by Dr. Novack on April 13, 2006. (Tr. 237-244.) He found that she has a normal range of motion ("ROM") of the cervical spine; slightly limited ROM of the lumbar spine; normal seated straight leg raise; normal ROM in the upper and lower extremities

bilaterally; normal deep tendon reflexes; and she was able to ambulate without assistance. (Tr. 238) Additionally, he found that she has no restrictions on lifting, standing/walking, or sitting. (Tr. 242-43.) Though she should never climb ropes, ladders, or scaffolding, and she should avoid hazardous heights, Dr. Novack determined that she can occasionally climb ramps/stairs, and can occasionally balance, stoop, crouch, kneel or crawl. (Tr. 243.) Consequently he determined that she could return to work. (Tr. 238.) Though claimant asserts that Dr. Novack's opinion was given too much weight in the analysis, the ALJ correctly noted that Novack's assessment is "consistent with the evidence of record when viewed in its entirety." (Tr. 19.)

Claimant further contends that the ALJ failed to give adequate weight to her allegations of chronic pain when making the residual functional capacity determination. (Doc. 17 at 6.) The ALJ acknowledged that claimant's condition would preclude heavy and strenuous exertion, but he indicated that the impairment should not produce the disabling level of pain to which she testified. (Tr. 19.)

The Eleventh Circuit has established a three-part test for determining

whether a claimant's pain is debilitating.  Holt v. Sullivan, 921 F.2d 1221, 1223 (11th Cir. 1991).  The pain standard requires: (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such severity that it can reasonably be expected to give rise to the alleged pain.  Id.  There is clearly an underlying medical condition in this case, so the analysis turns on the second and third elements.

As noted above, the record indicates that claimant's treating physicians never found any objective medical reason that adequately explained her pain.  Furthermore, the ALJ concluded that her subjective complaints were "not totally credible."  (Tr. 19)  He discounted her testimony regarding constant pain and numbness because the allegations were inconsistent with her testimony at the hearing.  (Id.) She testified at the hearing that she "cooks, washes dishes, vacuums, sweeps, and does laundry[, and] that her typical day includes mopping, wiping down cabinets, cleaning the bathroom, walking in the yard, and throwing a ball for the dog."  (Id.) Claimant's allegations of pain are also undercut by the fact that

she does not take any narcotic pain medications. (Id.) Finally, "her poor earnings record . . . shows poor motivation to work," further undermining her allegations. (Id.) Consequently, this contention is without merit. The ALJ's determination of residual functional capacity is supported by substantial evidence.

## IV.  CONCLUSION

Based on the foregoing, the decision of the Commissioner should be **AFFIRMED**.

**SO REPORTED AND RECOMMENDED** this  24th  day of April, 2008.

/s/ **G.R. SMITH**
**UNITED STATES MAGISTRATE JUDGE**
**SOUTHERN DISTRICT OF GEORGIA**